KERR–McGEE CORPORATION, Cyprus Foote Mineral Corporation and Rio Algom, Ltd., Plaintiffs,

v.

Kee Tom FARLEY, Individually and on behalf of the Estate of Lucy K. Farley, Carmelita Farley Joe and Harold Kady, Sr., Individually and on behalf of the Estate of Julia Mae Kady, Defendants.

Civ. No. 95–0438 MV.

United States District Court,
D. New Mexico.

June 8, 1995.

Michael R. Comeau, Jon J. Indall, Carpenter, Comeau, Maldegen, Brennan, Nixon & Templeman, Santa Fe, NM, for Kerr–McGee Corporation.

Robert N. Hilgendorf, Santa Fe, NM, Tom Galbraith, Jessica Youle, Lewis & Roca, Phoenix, AZ, for Cyprus Foote Minerals Corporation.

John D. Robb, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, NM, for Rio Algom, Ltd.

Mel E. Yost, Scheuer, Yost & Patterson, Santa Fe, NM, for Umetco Minerals Corporation, Union Carbide Corporation.

Kevin Gover, Gover, Stetson & Williams, Albuquerque, NM, Cherie V. Daut, Shiprock, NM, for Kee Tom Farley, Carmelita Farley Joe, Harold Kady, Sr.

## MEMORANDUM OPINION AND ORDER

VAZQUEZ, District Judge.

THIS MATTER came on for consideration of the Plaintiff's Complaint for Preliminary Injunction and Declaratory Judgment, filed April 21, 1995. Plaintiffs ask this Court to permanently enjoin Navajo Tribal Court proceedings and declare that the Navajo Tribal Court is without jurisdiction to hear and adjudicate any of the claims asserted against them in tribal court.

The Court has reviewed the Complaint, the Plaintiffs' Motion for Preliminary Injunction, filed April 21, 1995, and the Responsive pleadings and finds that the tribal abstention doctrine applies to this case and requires this Court to abstain from further action in this matter until the Tribal Court has ruled on the jurisdictional question.

## FACTUAL BACKGROUND

On January 12, 1995, three members of the Navajo tribe filed suit in Navajo Tribal Court against the above named Plaintiff Corporations which allegedly operated the Shiprock Mill, a uranium processing mill located on the Navajo Reservation, on leased tribal land.[1] The Tribal Court complaint seeks damages for alleged negligence and wrongful death arising out of the Corporations' alleged operation of the Shiprock Mill in violation of tribal law. The Corporations have not answered the tribal court complaint nor otherwise appeared in the Navajo Tribal Court on this matter; instead they filed this action.

Here, the Corporations assert that the Price–Anderson Act, 42 U.S.C. § 2011, et seq., contains an "express jurisdictional prohibition" to tribal court suits involving nuclear torts, thereby depriving tribal courts of jurisdiction and relieving them of any duty to exhaust tribal court remedies.

## DISCUSSION

■ The tribal exhaustion requirement, enunciated by the Supreme Court in 1985, is based on considerations of comity and the long-standing policy of promoting tribal self-government and self-determination. *National Farmers Union Ins. Co. & Lodge Grass Schl. Dist. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). In *National*, the Court held that tribal court remedies should be exhausted before the matter is heard in federal court. *Id.* The Court explained that the existence and extent

---

1. In 1953, Kerr–McGee Oil Industries Corporation leased tribal land near Shiprock, New Mexico, and entered into a contract with the Atomic Energy Commission to construct a uranium mill. Compl. Para. 2.1.2.

of a tribal court's jurisdiction requires a careful examination of tribal sovereignty and found "that examination should be conducted in the first instance in the Tribal Court." *Id.* at 856, 105 S.Ct. at 2454.

■ It is clear that the exhaustion doctrine does not strip this Court of jurisdiction over this matter as this Court retains both federal question and diversity jurisdiction. *See National Farmers,* 471 U.S. 845, 105 S.Ct. 2447; *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). It is equally clear that Supreme Court precedent requires, not as a jurisdictional prerequisite, but as a matter of respect, that this Court allow the tribal court to first hear and determine the challenge to its jurisdiction. *Id.*

■ "Proper respect for tribal legal institutions requires that they be given a full opportunity to consider the issues before them and to rectify any errors." *Iowa Mutual,* 480 U.S. at 16, 107 S.Ct. at 977.

■ Tribal exhaustion not only promotes tribal self-government and self-determination, it promotes judicial efficiency:

> The orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed ... exhaustion of tribal court remedies, moreover, will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review.

*National Farmers,* 471 U.S. at 856–57, 105 S.Ct. at 2454.

■ An exception to the tribal exhaustion requirement exists where tribal court jurisdiction "is patently violative of an express jurisdictional prohibition". *Id.* at 857 n. 21, 105 S.Ct. at 2454 n. 21.[2]

Plaintiffs urge that this exception applies here and relieves this Court of any obligation

to exercise comity and defer to the Navajo Tribal Court to first examine the jurisdictional challenge they pose. They emphatically argue that an express jurisdictional prohibition can be found in the language and legislative history of the amended Price–Anderson Act. Plaintiffs' arguments fail because they fail to reconcile their theories with Indian Sovereignty principles. Indeed, they ignore them.

■ Plaintiffs urge that an express jurisdictional prohibition exists because through the Price–Anderson Act, and its amendments, the federal government has preempted the nuclear regulatory field. They urge that in this comprehensive regulatory "system" lies the exclusive method for resolving nuclear tort claims, preempting any conflicting state law or regulation, and allowing for an absolute right of removal from state to federal court.

■ Plaintiffs err in assuming that tribes are to be treated as states. Indian tribes and the federal government are dual sovereigns. Tribes have a unique relationship with the federal government and occupy a unique status under the law. *See National Farmers,* 471 U.S. at 851, 105 S.Ct. at 2451. As Chief Justice John Marshall observed in the historical case of *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1931): "The condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence ... The relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else." *Id.* at 16.

■ The federal-tribal relationship is distinct in that it involves special trust obligations requiring the United States to adhere strictly to fiduciary standards in its dealings with Indians. F. Cohen, *Handbook on Federal Indian Law,* 207 (1982).

Accordingly, in its examination of the tribal exhaustion doctrine, this circuit has distinguished between federal-state jurisdiction and federal-tribal jurisdiction:

---

**2.** The Court recognizes there are two other exceptions to tribal exhaustion which are not at

issue here.

As in cases raising comity concerns regarding federal-state jurisdiction, comity concerns in federal-tribal civil jurisdiction, arise out of mutual respect between sovereigns. In the realm of federal-tribal jurisdiction, however, Congress has expressed *an additional interest in promoting the development of tribal sovereignty.* The Supreme Court has recognized this congressional intent and assiduously advocated federal abstention in favor of tribal courts.

*Smith v. Moffett,* 947 F.2d 442, 445 (10th Cir.1991) (emphasis added).

■ Plaintiffs incorrectly assert the Navajo Nation has no jurisdiction over this matter because the power to hear nuclear torts was not expressly delegated to them in Price–Anderson. This position turns the historic tribal sovereignty analysis on its head. It is clearly established law that Indian tribes do not derive their sovereign powers from congressional delegation. Rather, tribal sovereignty is inherent, and tribes retain "attributes of sovereignty over both their members and their territory, *to the extent that sovereignty has not been withdrawn by federal statute or treaty."* *Iowa Mutual,* 480 U.S. at 14, 107 S.Ct. at 975 (emphasis added); *See also United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (tribes possess aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependant status).

■ Tribal courts play a vital role in tribal self-government. *Id.* With respect to tribal court jurisdiction, civil jurisdiction over such activities *presumptively* lies in the tribal court unless *affirmatively limited* by a specific treaty provision or federal statute. *Id.* at 18, 107 S.Ct. at 977; *Smith,* 947 F.2d at 444 (emphasis added).

The Price–Anderson Act and its amendments are devoid of any mention of "Indians," "tribes," or "tribal-court jurisdiction." In *Iowa Mutual,* the Supreme Court refused to infer that Congress, in enacting the diversity statute, 28 U.S.C. § 1332, intended to limit tribal sovereignty, in the absence of express language to that effect:

> The diversity statute, 28 U.S.C. § 1332, makes no reference to Indians and nothing in the legislative history suggests any intent to render inoperative the established federal policy promoting tribal self-government.

480 U.S. at 17, 107 S.Ct. at 977. The Court reasoned that because tribes retain all inherent attributes of sovereignty that have not been expressly divested by the federal government, "the proper inference from silence ... is the sovereign power ... remains intact." *Iowa Mutual,* 480 U.S. at 18, 107 S.Ct. at 978 (*citing Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 149 n. 14, 102 S.Ct. 894, 908 n. 14, 71 L.Ed.2d 21 (1982).[3]

■ Interpreting silence in favor of Indians is consistent with the trust relationship existing between the federal government and the tribes. Since Congress is exercising a trust responsibility when dealing with Indians, courts presume that Congress' intent toward them is benevolent and have developed canons of construction that treaties and other federal action should, when possible, be read as protecting Indian rights and in a manner favorable to Indians. Cohen, *Handbook on Federal Indian Law* at 221. Once powers of tribal self-government or other Indian rights are shown to exist, subsequent federal action which might arguably abridge them is construed narrowly in favor of retaining Indian rights. *Id.* at 224.

Plaintiffs ignore these principles and insist that courts, including the Supreme Court, have inferred "an express jurisdictional prohibition" based on federal preemption principles even absent express language to that effect. Plaintiffs cite several cases in support of this contention that are inapplicable because they do not involve Indian tribes and, therefore, do not address tribal sover-

---

**3.** Plaintiffs cite *Iowa Mutual* for the general proposition that courts look to legislative intent to find express jurisdictional prohibitions. Plaintiffs ignore the significant fact that no legislative intent to prohibit jurisdiction was found in *Iowa Mutual,* where tribes were not even mentioned in the statute.

eignty concerns.[4] (*See* Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss at 10–11, n. 4.).

The cases cited by Plaintiffs which do involve Indian tribes are inapposite because they involved congressional legislation, which in addition to addressing jurisdiction, expressly addressed tribes. Plaintiffs refer to *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), where the Supreme Court found that legislation granting the federal government jurisdiction to try non-Indians for criminal offenses committed in Indian Country, implicitly preempted tribal jurisdiction.

In creating the exhaustion requirement, *National Farmers* expressly rejected implying pre-emption in the civil context:

> If we were to apply the *Oliphant* rule here, it is plain that any exhaustion requirement would be completely foreclosed because federal courts would be the only forums for civil actions against non-Indians. For several reasons, however, the reasoning of *Oliphant* does not apply to this case.

471 U.S. at 854, 105 S.Ct. at 2453. The Court went on to explain that its determination in *Oliphant*, that Congress had preempted tribal jurisdiction, was based on the fact that Congress chose to enact legislation which implicitly limited tribal court jurisdiction by expressly granting federal courts criminal jurisdiction over offenses committed in Indian Country. *Id.* The Court further stated there was no comparable legislation in the civil context.[5]

Here, Congress has not similarly acted to limit tribal court jurisdiction in Price–Anderson. *Oliphant* involved congressional action specifically and expressly affecting In-

dian tribes. As stated earlier, the Price–Anderson Act does not mention Indian tribes. Plaintiffs' reliance on *Oliphant* ignores clear precedent and is clearly misplaced. The Supreme Court distinguished it and rejected it in the civil context.

Plaintiffs' reliance on *Blue Legs v. United States Bureau of Indian Affairs*, 867 F.2d 1094 (8th Cir.1989), is also misplaced. In *Blue Legs*, the Eighth Circuit held that federal courts had exclusive jurisdiction over suits under the Resource Conservation and Recovery Act, (RCRA) 42 U.S.C. § 6901 et seq. and, therefore, did not require exhaustion of tribal remedies. Again, RCRA, unlike the Price–Anderson Act, specifically dealt with Indian tribes and subjected them to suit, while mandating a federal forum.[6]

Similar to *Oliphant*, the inference that the government had taken away tribal jurisdiction was based on language in the statute which expressly addressed Indians. Congressional intent to affect Indians in those cases was clear.

Plaintiffs cite no cases similar to the one before the Court, where a statute which makes no mention of "Indians" or "Indian tribes" has been construed to strip tribes of their sovereign powers.

As additional support for federal preemption, Plaintiffs assert that the nuclear industry is particularly tied to concerns of national security and, therefore, of greater federal concern than other contexts in which courts have tended to require a specific,

**4.** A few of the cases relied on by Plaintiffs involve the Price Anderson–Act but are inapplicable because they address federal-state jurisdictional issues involved in Price–Anderson and do not address tribes or tribal sovereignty issues. Plaintiffs cite to *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994) and *In re TMI Litigation Cases Consol. II*, 940 F.2d 832 (3d Cir.1991), as creating an express jurisdictional prohibition by interpreting Section 2218 of the Act as requiring that all cases from a nuclear incident be consolidated before a single federal district court.

**5.** Additionally, the Supreme Court explained that its decision in *Oliphant* was also based on historical distinctions between the way criminal and

civil jurisdiction was addressed in tribal treaties: where criminal jurisdiction was sometimes ceded, civil jurisdiction was not. *See* 471 U.S. at 854–55, n. 17, 105 S.Ct. at 2453, n. 17 (*quoting* Cohen, *Handbook of Federal Indian law* at 253–54 ("In the civil field Congress has never enacted general legislation to supply a federal or state forum for dispute between Indians and non-Indians in Indian country").

**6.** In *Blue Legs*, members of the Oglala Sioux Tribe (Tribe) sued the Environmental Protection Agency, the Bureau of Indian Affairs, Indian Health Services and the tribe in federal court claiming that garbage dumps located on the reservation were maintained in violation of the Act. 867 F.2d 1094.

enunciated limitation to tribal jurisdiction.[7] It is undisputed that the nuclear industry poses unique security and safety issues that are appropriately addressed by federal legislation. However, the need to regulate and monitor the nuclear industry is not necessarily irreconcilable with long-standing Indian Sovereignty principles, which have important, competing concerns of their own.[8]

■ Finally, with respect to federal preemption, even assuming Price–Anderson is the only means of litigating nuclear torts, this does not establish that tribal courts are without jurisdiction to apply Price–Anderson. Whether such actions are required to be litigated under the Price–Anderson Act is not dispositive of the jurisdictional question.[9]

Finally, Plaintiffs contend that this Court must separately weigh the three policy concerns behind the tribal exhaustion rule, as identified by the Supreme Court in *National Farmers*.[10] This circuit has required that these factors be separately addressed only where the dispute involves non-Indian activity occurring outside the reservation. *Texaco v. Zah*, 5 F.3d 1374, 1378 (10th Cir.1993); *Pittsburg and Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531 (10th Cir.1995); *United States v. Tsosie*, 849 F.Supp. 768, 772 (D.N.M.1994); *Atkinson Trading Co. v. Navajo Nation*, 866 F.Supp. 506, 511 (D.N.M. 1994).

■ When the activity at issue arises on the reservation, these policies almost always dictate that the parties exhaust their tribal remedies before resorting to the federal fo-rum. *Texaco*, 5 F.3d at 1378. *See also Crawford v. Genuine Parts Co.*, 947 F.2d 1405, 1408 (9th Cir.1991) ("When the dispute is a reservation affair ... there is no discretion not to defer"). Thus, this circuit has characterized the tribal exhaustion rule as "an inflexible bar to consideration of the merits of the petition by the federal court." *Id. (quoting Smith*, 947 F.2d at 445).

Only where a dispute involves off-reservation activity are the policies behind tribal exhaustion "not so obviously served" and under those circumstances this circuit looks to district courts to "examine assiduously the *National Farmers* factors in determining whether comity requires the parties to exhaust their tribal remedies before presenting their dispute to the federal courts." *Id.*

The Court was unpersuaded that it should ignore tribal sovereignty issues in this case and preclude the tribal court from jurisdiction and enjoin its proceedings on the basis of federal preemption principles and case law which are silent on tribal concerns.

### Plaintiffs Rio Algom Unlimited, UMETCO Mineral Corporation and Union Carbide Corporation.

■ Plaintiffs Rio Algom Unlimited, UMETCO Mineral Corporation and Union Carbide Corporation urge that they are "outside the scope" of the tribal exhaustion doctrine because they have conducted no activity on Navajo tribal land and have no connection to any of the other defendants in the tribal action, to the Shiprock Mill or to any of its alleged operators or operations.

7. Moreover, Plaintiffs argument that federal courts have exclusive jurisdiction over Price–Anderson actions is belied by the fact that state courts have concurrent jurisdiction over Price Anderson actions. The Act provides an absolute right of removal to federal court, but does not mandate removal.

8. To permit the judicial system of the Navajo Nation to hear a complaint filed by Navajo tribal members who claim they were injured as a result of the Corporations' operation of the Shiprock Mill in violation of tribal law does not jeopardize the security and safety concerns which prompted the Price Anderson Act and which underlie the Plaintiffs' pre-emption argument.

9. Indeed, the Court was persuaded by the detailed discussion in Plaintiffs' brief and in their oral presentation to the Court, at the May 26, 1995, hearing, that Price–Anderson may well be the applicable substantive law to be applied in nuclear tort cases. However, whatever the proper substantive law may be, it is separate and apart from the jurisdictional question.

10. (1) to further the congressional policy of supporting tribal self-government; (2) to promote the orderly administration of justice; and (3) to obtain the benefit of tribal expertise. *National Farmers*, 471 U.S. at 856–57, 105 S.Ct. at 2453–54.

In order for this Court to determine the merits of these contentions, it would have to place the cart before the horse and circumvent the exhaustion requirement on arguments properly made in a Motion to Dismiss to the Court asserting jurisdiction. Moreover, this is a factual dispute which *National Farmers* expressly stated should be heard in the forum whose jurisdiction is being challenged. 471 U.S. at 856, 105 S.Ct. at 2453.[11]

In addition, this circuit summarily rejected a similar argument in *Bank of Oklahoma v. Muscogee Nation,* 972 F.2d 1166, 1169 (10th Cir.1992). In *Muscogee,* the bank claimed there was no tribal court jurisdiction because the banking activity in question took place off tribal land. The court referred to *National Farmers* and Tenth Circuit case law on tribal exhaustion and stated: "this jurisdictional argument should first be heard in tribal court."

Defendants who feel they have been improperly brought into court routinely move for dismissal. However, insistent in their resistance to tribal authority, Plaintiffs creatively argue that the tribal exhaustion doctrine does not apply to them given their lack of any activity on the Navajo Reservation. This approach would effectively render the doctrine of tribal exhaustion and all its underlying concerns moot, as it would allow non-Indian defendants to side-step tribal courts altogether by raising their defenses or grounds for dismissal to a federal district court prior to ever answering in tribal court. The federal court ruling could essentially pull jurisdiction out from under the tribal courts' reach.

Contrary to their contentions, Plaintiffs Rio Algom, UMETCO Mineral and Union

Carbide are no different from the other Corporations with respect to the tribal exhaustion requirement, regardless of their factual jurisdictional defense.[12]

■■■ Tribal authority over activities of non-Indians on reservation lands is an important part of tribal sovereignty. *Iowa Mutual,* 480 U.S. at 18, 107 S.Ct. at 977 (*citing Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)). The Price–Anderson Act does not affirmatively limit tribal court jurisdiction. Although Congress has plenary power to define the jurisdiction of tribal courts, it did not exercise that power, when it drafted the Price–Anderson Act. *See Tsosie,* 849 F.Supp. at 773. The Act makes no reference to Indians and nothing in the legislative history suggests any intent to render inoperative the established policy promoting tribal self-government. *See Iowa Mutual,* 480 U.S. at 17, 107 S.Ct. at 977.

Furthermore, it was by virtue of federal government contracts that nuclear mills were constructed and operated on the Navajo reservation. Congress is obviously aware of the possibility of nuclear torts occurring on tribal lands. To date it has not addressed tribal court jurisdiction over such matters. Be it intentional or an oversight, until Congress addresses the issue, this Court will not interpret its silence as "an express jurisdictional prohibition" to tribal court jurisdiction so as to render the exhaustion doctrine inapplicable. To do so would ignore important Congressional and judicial concerns regarding tribal sovereignty.

As a matter of respect to the Navajo Tribal Court, all proceedings in this Court are

---

11. Congress' policy of supporting tribal self-government "favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the *factual* and legal basis for the challenge." *Id.* (emphasis added).

12. Plaintiff Rio Algom misconstrues *Pittsburg and Midway Coal Mining Co. v. Watchman* in a supplemental brief filed, May 9, 1995. *Pittsburg* involved a reservation boundary dispute where the application of the exhaustion doctrine de-

pended on a district court's determination of what percentage of land at issue in that case constituted "Indian Country." The Tenth Circuit did not determine the issue but instead remanded the case back to the district court. The distinctions between *Pittsburg* and *National Farmers* and *Iowa Mutual,* relied on by this Court, were expressly noted by this circuit in its opinion in *Smith,* 947 F.2d at 445 (citing an earlier decision of the same case). Contrary to Rio Algom's assertions, *Pittsburg* supports abstention.

stayed until tribal court proceedings are exhausted.[13]

---

**13.** Ultimately, this Court may determine whether the Tribe's decision, whatever it may be, is consistent with its sovereign authority or the Navajo Tribal Court could rule in Plaintiffs' favor and eliminate the need for any further action.